# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00687-CV

---

**R. C. C. and N. T., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 274TH DISTRICT COURT OF HAYS COUNTY
### NO. 19,1739, THE HONORABLE DWIGHT E. PESCHEL, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

R.C.C. (Father) and N.T. (Mother) appeal from the trial court's amended order of termination.[1] Following a jury trial, the trial court terminated their parental rights to T.C. (Child) and appointed the Texas Department of Family and Protective Services as Child's permanent managing conservator. In his three issues, Father argues that there was no evidence to support the jury's predicate-ground findings against him. *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions or surroundings), (E) (endangering conduct), (N) (constructively abandoning). In her four issues, Mother challenges the trial court's jurisdiction and discovery sanctions and contends that the trial court failed to properly apply the law. For the following reasons, we affirm the trial court's amended order of termination.

---

[1] We refer to R.C.C. and N.T. and their child by their initials or as Father, Mother, and Child. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

# BACKGROUND

In July 2019, the Department received intakes for neglect of ten-month-old Child based on allegations of violence, drug activity, and Mother using methamphetamine when she was pregnant with Child and breastfeeding Child. A Department investigator located Mother and Child at an apartment, but the investigator was not allowed entry. Mother told the investigator to call her attorney and closed the door. The investigator called Mother's attorney, who was later determined to be Mother's mother (Grandmother), but Grandmother "yelled" and then "hung up" on the investigator. The Department filed a petition in aid of its investigation, and the trial court ordered Mother to allow the Department access to Child and for Child to be medically examined. The investigator returned to the apartment the next day with the trial court's order, but Mother and Child were no longer there. The Department provided a copy of the order to Grandmother and contacted Father to try to locate Mother and Child.

Within a few days, the Department amended its petition to seek, among its requested relief, to terminate the parent-child relationship. The trial court signed an order for protection of a child in an emergency and appointed the Department as Child's temporary managing conservator. The trial court also signed an order for the issuance of a writ of attachment with respect to Child. Within a week, Mother, still represented by Grandmother, filed an original answer and motion to transfer the case to Dallas County. Mother also filed an affidavit of indigency with the trial court, but she stated in the affidavit that Grandmother was representing her at "no charge." Shortly after Mother filed her answer and motion to transfer, the trial court signed orders for the issuance of a writ of habeas corpus for Child, requiring the

parents to produce Child in court on August 8.[2] Neither parent complied with the trial court's orders, and the Department was not able to locate Child until December 31, when it located Mother and Child at a doctor's office in Dallas. The Department took custody of Child at the office, and the police arrested Mother for interference with child custody. Child was examined at a hospital, drug tested, and placed with foster parents.

In early January 2020, the trial court held a permanency hearing that both parents attended. In its corresponding order, the trial court referenced the Department's service plans for the parents and found that they had not demonstrated adequate and appropriate compliance with the plans. Shortly after this hearing, the Department learned the results of Child's hair follicle testing and sought findings of aggravated circumstances because the test results showed very high levels of methamphetamine.[3] *See* Tex. Fam. Code § 262.2015(b)(3)(I); *see also* Tex. Penal Code § 22.041 (providing that person commits offense if he or engages in conduct that endangers child). Child also was diagnosed with amphetamine poisoning and had symptoms that included not being able to sit upright or interact as would be expected of a one-year-old. In February 2020, the trial court signed an order finding aggravated circumstances and removing the Department's obligation to provide services or to make reasonable efforts to return Child to the parents.[4] *See* Tex. Fam. Code § 262.2015(a).

---

[2] *See* Tex. Fam. Code §§ 157.371–.376.

[3] The results of the Child's hair follicle drug screen were positive for methamphetamine (26,602 level) and amphetamine (1,311 level).

[4] In its order, the trial court expressly found:

Child was endangered by the parents' usage of drugs and/or having drugs in the vicinity of the child that allowed the child to "ingest" said methamphetamines which resulted in the child's positive hair follicle.

Due in part to the COVID-19 pandemic, the trial court granted multiple extensions of the dismissal date. The jury trial occurred from November 29 to December 6, 2021. At the time of trial, there were pending criminal charges against Mother and Grandmother for interference with child custody, and although represented by court-appointed counsel and subpoenaed to appear as a witness, Father did not personally appear. The witnesses included Mother, a former friend of Mother's, the Department's investigator and conservatorship worker assigned to Child, the foster parents, and the Court Appointed Special Advocates (CASA) supervisor and volunteer assigned to Child.

The Department sought to terminate the parents' rights so that the foster parents could adopt Child. The evidence showed that Child tested positive at high levels for amphetamine and methamphetamine in January 2020 and had been delayed in her fine and gross motor skills but that she was doing well and no longer delayed. The foster parents were taking good care of Child, meeting her needs, bonded with her, and hoped to adopt her if the parents' rights were terminated. The Department also presented evidence that from July through December 2019, Mother and Child moved around to different locations, including staying in different motels; that "[m]ultiple Dallas county workers" spoke to Father in person at a residence in Dallas "to encourage him to assist [in] assuring [Child] was safe"; and that Father saw Mother and Child at least monthly during this time period. Mother testified that during this time period, she was Child's primary caregiver, Father also was a caregiver and "probably" saw them weekly, and she was unaware that the Department was looking for her.[5]

---

[5] The caseworker also testified about Mother's testimony at the January 2020 hearing, including her testimony that she and Father were the only ones who had been with Child for the previous 90 days. By the time of the 2021 trial, Mother testified that she did not know where Father was living, that the last time she had contact with him, "he was either at his friend's house

Mother also denied that she breastfed Child when she was using drugs, but Mother's former friend testified that she observed Mother smoking or "shooting up" methamphetamine with a syringe and then breastfeeding Child.[6] Mother testified that she stopped using drugs when she found out she was pregnant and did not use again until Child was about seven or eight months old when she "just like kind of lost control again." Mother admitted that she had had a drug problem, including using heroin and methamphetamine and intravenous drugs, but testified that her last use was on January 6, 2020.[7] In February 2020, Mother had one visit with Child but did not have any other visits with Child. Mother began an inpatient rehabilitation program which she completed in April 2020, but she tested positive for amphetamine and methamphetamine in August 2020. During the case, Mother had another child, and at the time of trial, she and that child were living in the Dallas area with Grandmother.

Concerning Father, the evidence established that he did not engage and had minimal contact with the Department during the case. Father attended only one court hearing in early January 2020 and did not personally appear for trial. The evidence also showed that Father did not visit or ask to visit with Child; had a criminal history, including being incarcerated after Child was born; and was aware of the Department's attempts to locate Child but did not provide

or his cousin's" or "more likely" with his grandmother, and that he was difficult to stay in touch with but that she thought he had his own phone and had a bicycle for transportation.

[6] Mother's friend answered, "Yes," when asked if she saw Mother "use meth and then witness her breastfeeding shortly after she ingested meth" and testified that it happened "a few times." She also testified that from the latter part of 2018 into the spring of 2019, it was common for Mother to "shoot up methamphetamines" and that Child was present, "just usually in the carrier," when Mother was using drugs.

[7] The evidence supported a finding that Mother's drug addiction was severe. Although she testified that she did not fill out an intake form for a treatment program in January 2020 and that it was filled out so that she "would look like a priority," the form represented that she had used drugs 25 out of 30 days prior to admission and that she used methamphetamine and heroin.

5

assistance.[8]  The caseworker testified that she sent letters to Father at the address where he was incarcerated; that after he was released on parole in August 2019, she received Father's address and phone number from his parole officer; but that she only spoke to Father twice—by phone on the day of removal and in person at the January 2020 hearing.

The CASA supervisor also only spoke with Father twice during the case.  The CASA supervisor testified that in July 2021, he called and spoke to Father by phone and provided the contact information for Father's court-appointed attorney, and that Father told him that "it was his hope for [Child] to be placed back with [Mother]" and that he "didn't believe any of it" about Mother's drug use and exposing Child to methamphetamine.  The CASA supervisor also called and spoke to Father by phone during the jury trial, and Father said that he "had no idea what was going on" but confirmed that he had the contact information for the CASA supervisor and his attorney.  Father also told the CASA supervisor that he would try to attend trial but that "it was still his goal for [Child] to be reunified with [Mother]."

The jury found that:  (i) Father and Mother knowingly placed or knowingly allowed Child to remain in conditions or surroundings that endangered Child's physical or emotional well-being, (ii) Father and Mother engaged in conduct or knowingly placed Child with persons who engaged in conduct that endangered Child's physical or emotional well-being, (iii) Father constructively abandoned Child, and (iv) it was in Child's best interest for the parents' rights to be terminated.  *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (2).  The trial court thereafter signed the amended order of termination.  The parents' appeals followed.

---

[8]  The conservatorship caseworker testified that Father "was hard to communicate with, sometimes his number's working, sometimes it wasn't."

6

## ANALYSIS

**Father's Appeal**

In his three issues, Father challenges the legal sufficiency of the evidence to support the jury's predicate-ground findings against him.[9]

*Standard of Review*

To terminate parental rights under section 161.001, the Department has the burden to prove one of the predicate grounds in subsection (b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is clear and convincing evidence. Tex. Fam. Code § 161.206(a); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases"). The clear and convincing evidence standard is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence").

---

[9] We construe Father's challenge as a legal sufficiency challenge to the evidence because his requested relief is to reverse and render and he argues that there was no evidence to support the predicate-ground findings. *See Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176 (Tex. 1986) (per curiam) (explaining "basic rule" that "no evidence" points require rendition in favor of appealing party); *Green v. Villas on Town Lake Owners Ass'n*, No. 03-20-00375-CV, 2021 Tex. App. LEXIS 8569, at *14, n.2 (Tex. App.—Austin Oct. 22, 2021, pet. filed) (mem. op.) (construing issue as legal sufficiency challenge because appellant only made legal sufficiency arguments and requested reverse and render); *Maynard v. Booth*, 421 S.W.3d 182, 183 (Tex. App.—San Antonio 2013, pet. denied) (reviewing evidence under legal sufficiency standard because appellant's requested relief was reverse and render).

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.*

*Endangerment Findings*

Although Father challenges each of the jury's predicate-ground findings against him, we limit our review to his challenge to the legal sufficiency of the evidence to support the jury's findings under subsections (D) and (E)—that (i) Father knowingly placed or knowingly allowed Child to remain in conditions or surroundings that endangered Child's physical or emotional well-being, and (ii) Father engaged in conduct or knowingly placed Child with persons who engaged in conduct that endangered Child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis for appeal challenging subsection (D) or (E) finding because of their collateral consequences in future termination proceedings); *In re A.V.*, 113 S.W.3d at 362 (explaining that Department has burden to prove one predicate ground and that termination is in child's best interest).

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531,

8

533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," the conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13–14 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.* at *14 (citing *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied)).

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied.). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.* In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* at *10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex.

9

App.—Fort Worth 2009, no pet.)). Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See id.* at *11 (citing *In re M.R.J.M.*, 280 S.W.3d at 503).

Father concedes that Mother's drug addiction created an environment that endangered Child's physical and emotional health and that she engaged in endangering conduct but argues that there was no evidence that he "himself, engaged in conduct that endangered [Child's] well-being" or "that [he] knew about Mother's environment, her drug use, or that he was ever tune[d]-in into the child's circumstances." He argues that the "jury simply ascribed Mother's drug-induced behavior to [him], not because of any evidence, but because of [his] assumed association with Mother." He further argues that "there was no evidence presented as to the circumstances surrounding [his] visitation [with Child], or whether [he] was aware of the potential dangers to [Child] posed by Mother's environment." Relying on Mother's testimony that she presently was not married, Father further argues that it was the Department's burden to prove that he knew he was Child's biological father and that there was no evidence "relating to [his] knowledge of his paternity to [Child] prior to December 31, 2019."

Father, however, did not challenge his paternity with the trial court at any time, and Mother testified that she and Father "lived together for a long time" and that they were "common-law married."[10] *See* Tex. Fam. Code § 160.204(a)(1) (stating that man is presumed to be father of child if married to mother of child and child is born during marriage); *see also id.* § 2.401 (stating proof required to show informal marriages). The order from the January 2020

---

[10] Mother testified that she had filed a petition for divorce from Father, and in her motion to transfer the case to Dallas County, Mother represented that the Department's case should be consolidated with her divorce suit, "which includes the child, the subject of this suit."

hearing reflects that Father was the presumed father of Child and that he appeared in person and announced ready, and the trial court found that Father was entitled to court-appointed counsel. *See In re K.P.*, No. 09-13-00404-CV, 2014 Tex. App. LEXIS 9263, at *33–34 (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.) (citations omitted) (concluding that father's argument that there was no evidence establishing paternity was without merit where father did not raise argument with trial court, never challenged paternity, and filed or signed documents that identified him as "Presumed Father"). The evidence also supported a reasonable inference that Father was aware that he was Child's biological father before Child was removed. Mother testified that she and Father were Child's caregivers prior to Child's removal. In addition, "[m]ultiple Dallas county workers" spoke to Father in person at a residence in Dallas "to encourage him to assist [in] assuring [Child] was safe," and he did not question to them his paternity.

Further, even if there was no direct evidence that Mother used methamphetamine or other illegal drugs in Father's presence, the jury could have reasonably inferred from the evidence that Father was aware of Mother's drug use and should have known that Child was being harmed and in danger of further harm in Mother's care, but that he did not protect Child. The caseworker testified that Father had shown that he was not able to keep Child safe because he was aware of Mother's conduct when Child was in her care but did not do "anything to protect [Child]." Evidence also showed that when Child was removed, Child had visible symptoms that something was wrong—Child was unable to sit upright and was not interactive— but Father had not done anything to address these symptoms. During the five-month period that the parents were court-ordered to allow the Department access to Child, Mother and Father were Child's caretakers, Mother and Child were moving around to different locations, and Father was

11

with Mother and Child more than once a month.[11] *See Pruitt*, 2010 Tex. App. LEXIS 10272, at *14 ("Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being."). Mother was continuing to use methamphetamine while taking care of and breastfeeding Child,[12] and she testified that "everybody [she] hung out with" was using drugs. *See id.* at *20 (considering evidence that parent left children with unsuitable person to be relevant to issue of endangerment); *see also In re J.J.W.*, No. 14-18-00985-CV, 2019 Tex. App. LEXIS 3329, *19–20 (Tex. App.—Houston [14th Dist.] Apr. 25, 2019, pet. denied) (mem. op.) ("A parent endangers her children by accepting endangering conduct of other people.").

The evidence further showed that Father had a criminal history, was incarcerated after Child was born, and did not engage with Child or the Department during the case. *See In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (explaining that factfinder may infer that parent's lack of contact with child and absence from child's life "endangered the child's emotional well-being"); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child." (citation omitted)). When asked if Father could have exposed Child to methamphetamine, Mother testified that she "thought [Father] had quit"

---

[11] Mother's testimony was inconsistent about the frequency of Father's contact with her and Child during the period that the Department was trying to locate Child, but she consistently testified that he had in-person contact with them. When asked how frequently she saw Father, Mother answered "[p]robably more" than monthly but "[n]ot necessarily weekly," and she testified that Child was always with her, although she sometimes left Child alone with Father in a different room from where she was.

[12] Mother denied that she was breastfeeding Child when she was using drugs, but the results from Child's hair follicle test conflict with her testimony.

12

but did not know because "he's kind of secretive to [her]," and during the case, Father did not visit with Child, had limited contact with the Department, did not provide financial support for Child, and did not appear for trial.[13]

Viewing the evidence under the applicable standard of review, we conclude that the evidence was legally sufficient to support the jury's findings that Father knowingly placed or knowingly allowed Child to remain in conditions or surroundings that endangered Child's physical or emotional well-being and that he engaged in conduct or knowingly placed Child with persons who engaged in conduct that endangered Child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d at 232–33, 237; *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule Father's first and second issues and do not reach his third issue addressing the jury's finding that he constructively abandoned Child. *See* Tex. Fam. Code § 161.001(b)(1)(N); *In re N.G.*, 577 S.W.3d at 232–33.

**Mother's Appeal**

*Trial Court's Jurisdiction*

In her first issue, Mother argues that the trial court lost jurisdiction on July 20, 2020, because it did not comply with the procedural requirements of section 263.401 of the Texas Family Code when it extended the initial dismissal date under section 3b(i) of the Texas Supreme Court's *Eighteenth Emergency Order Regarding the COVID-19 State of Disaster*. *See* 609 S.W.3d 122, 122–23 (Tex. 2020) (effective date June 29, 2020) (*Eighteenth Emergency Order*). In her second issue, Mother argues that even if the trial court properly extended the initial dismissal date, it lost jurisdiction on December 26, 2020, under section 3b(ii) of the

---

[13] Mother testified that during the case, Father sent her some money to get presents for Child's birthday in 2020.

*Eighteenth Emergency Order* because December 26, 2020, was 180 days from the effective date of the order.

Section 263.401(a) of the Texas Family Code provides for the automatic dismissal of a suit filed by the Department requesting termination or conservatorship unless the trial court has commenced the trial on the merits or granted an extension "on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." Tex. Fam. Code § 263.401(a). The statute allows one extension that does not exceed 180 days from the one-year dismissal date if the trial court finds that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b).

When the associate judge extended the initial one-year dismissal date on July 15, 2020, the Supreme Court had authorized trial courts to modify and extend the deadlines in section 263.401, except that an initial extension still had to comply with section 263.401:

> 3. Subject only to constitutional limitations, all courts in Texas may in any case, civil or criminal—and must to avoid risk to court staff, parties, attorneys, jurors, and the public—without a participant's consent:
>
> a. except as provided in paragraph (b), modify or suspend any and all deadlines and procedures, whether prescribed by statute, rule, or order, for a stated period ending no later than September 30, 2020;
>
> b. in all proceedings under Subtitle E, Title 5 of the Family Code:
>
> (i) extend the initial dismissal date as calculated under Section 263.401(a) only as provided by Section 263.401(b) or (b-1);
>
> (ii) for any case previously retained on the court's docket pursuant to Section 263.401(b) or (b-1), or for any case whose dismissal date was previously modified under an Emergency Order of this Court related to COVID-19, extend the

14

dismissal for an additional period not to exceed 180 days from the date of this Order; . . . .

See *Eighteenth Emergency Order*, 609 S.W.3d at 122–23; *C.C. v. Texas Dep't of Family & Protective Servs.*, No. 03-21-00587-CV, 2022 Tex. App. LEXIS 2477, at \*9 (Tex. App.—Austin Apr. 15, 2022, no pet.) (mem. op.) (noting that beginning with *Eighteenth Emergency Order*, trial courts were required to comply with section 263.401(b) requirements before extending *initial* dismissal date).

In the order extending the initial dismissal date, the associate judge determined that the initial dismissal date was July 20, 2020, extended the dismissal date pursuant to the *Eighteenth Emergency Order*, and set January 16, 2021, as the new dismissal date.[14] The associate judge expressly referenced the "statewide public health disaster due to the COVID-19 pandemic" and found that "extraordinary circumstances necessitate extending the dismissal date in this case . . . to avoid risk to court staff, parties, attorneys, jurors, and the public." The case had been set for a bench trial in May 2020, but Mother filed a jury demand in April 2020 and filed a motion for jury trial in response to the May bench trial setting. No jury trials were occurring at that time because of the pandemic. Mother sought a de novo hearing from the associate judge's order seeking to have the extension of the dismissal date denied and the case dismissed. Following the de novo hearing, the trial court signed an order denying Mother's requested relief.

Mother agreed during the de novo hearing that the pandemic was an "extraordinary circumstance" but argues that the trial court's extension of the dismissal date did

---

[14] The order also references the *Seventeenth Emergency Order Regarding the COVID-19 State of Disaster*, but the *Eighteenth Emergency Order* was the one in effect when the associate judge signed the order extending the dismissal date.

15

not comply with section 263.401 because the court did not make the required section 263.401(b) findings of extraordinary circumstances and best interest. During the de novo hearing, the trial court stated:

> I think the emergency order is basically a supplement to the statutory exemption. In other words, you can meet the statutory exemption and get an extension or under the emergency order you can get an extension.

Mother also asked the trial court if they were "going to get a finding that it's in the best interest of the child or it's just per the Covid-19 emergency order," and the trial court responded, "Yes, ma'am. That's what I think [the associated judge] based it on and that's what I think your de novo is on."

Although the trial court did not make express section 263.401 findings in its de novo order or on the record during the de novo hearing, we cannot conclude that the trial court lost jurisdiction when it extended the initial dismissal date. As an initial matter, we observe that "the plain language of section 263.401 does not require the trial court to conduct a hearing before granting an extension," *In re T.T.F.*, 331 S.W.3d 461, 475 (Tex. App.—Fort Worth 2010, no pet.), or to make express findings in a written order, *see* Tex. Fam. Code § 263.401(b); *In re G.X.H.*, 627 S.W.3d 288, 299 (Tex. 2021) (observing that trial court may make section 263.401 findings orally in presence of court reporter (citing Tex. Fam. Code § 101.026)).[15] Further, in the associate judge's order, there is an express finding of "extraordinary circumstances" with

---

[15] As support for her position that the trial court lost jurisdiction, Mother cites *In re A.W.*, 623 S.W.3d 519 (Tex. App.—Waco 2021, no pet.). In that case, the Waco Court of Appeals concluded that the order of termination was void because the trial court's order granting an extension did not include required section 263.401 findings and there was nothing in the record to reflect that the extension was in child's best interest. *See id.* at 522. That case, however, was decided before the Texas Supreme Court made clear in *In re G.X.H.*, 627 S.W.3d 288, 299 (Tex. 2021), that section 263.401 does not require written findings in an order extending the dismissal date. Further, in this case, the record supports that the extension was in Child's best interest.

reference to the pandemic, and because best interest is always a court's primary consideration, we imply that the associate judge found that it was in Child's best interest to grant the extension. *See* Tex. Fam. Code § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."). When the associate judge granted the extension of the dismissal date, the trial court already had found that there were aggravated circumstances based on the Child's exposure to methamphetamine and removed the Department's obligation to make reasonable efforts to return Child to the parents. *See id.* § 262.2015(a).

Moreover, in the trial court's de novo order denying Mother's requested relief, the trial court expressly referenced "COVID-19":

> [Mother's] de novo of associate judge's July 15, 2020 order extending statutory dismissal date based upon COVID-19 is denied. For clarification purposes, the De Novo hearing was granted and held, but the relief requested by the Respondent was denied and the statutory dismissal date was extended.

Thus, we imply that the trial court agreed with the associate judge's express finding of extraordinary circumstances and implied finding of best interest. *See* Tex. Fam. Code § 201.015 (describing scope of de novo hearing before referring court); *In re A.L.M.-F.*, 593 S.W.3d 271, 277 (Tex. 2019) (explaining that "review under section 201.015 is not entirely independent of the proceedings before the associate judge"); *see also D.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00454-CV, 2021 Tex. App. LEXIS 1565, at *25 (Tex. App.—Austin Mar. 3, 2021, no pet.) (mem. op.) (implying necessary findings to support trial court's denial of

17

section 263.401 motion (citing *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 53 (Tex. 2003)).[16]

As the Department explained during the de novo hearing, an extension was required because of Mother's jury demand and the impossibility of holding a jury trial before the initial dismissal date:

> Based upon these circumstances that [Mother] has filed a jury demand, and the purpose for the extension is because juries cannot be held without undue risk at this time. Had this been a bench trial, the Department certainly would have brought this and had conclusion to this case.
>
> Unfortunately, due to the jury demand, it is not only impractical, but it's actually impossible, as you are aware, to have a jury setting in Hays County. Based on this, we have requested an extension for January 16th, 2021. We did secure a jury trial date in front of Your Honor for November of 2020.
>
> The Department plans to continuously—to proceed once jury trials are started in Hays County. If there is an earlier setting, we'll be happy to make those arrangements. Unfortunately, it's through no fault of the Department, nor Hays County. It is a global pandemic that there is such emergency orders and the need for these extensions.
>
> If [Grandmother] and her client wish to withdraw the jury demand, we can certainly get a bench trial much sooner, and we're ready to proceed as this Court sees fit.

Mother agreed during the do novo hearing that "Coronavirus is an extraordinary circumstance," and the trial court stated that "we can't hold jury trials right now" and "the law and the Court's

---

[16] Mother refers to the reporter's record of the de novo hearing before the trial court. The reporter's record was filed in a related original proceeding that Mother brought from the underlying proceeding. *See In re N.T.*, No. 03-21-00232-CV, 2021 Tex. App. LEXIS 4561 (Tex. App.—Austin June 9, 2021, orig. proceeding) (mem. op.). We take judicial notice of the reporter's record from the de novo hearing to address Mother's arguments. *See In re Innovation Res. Solution, LLC*, No. 12-15-00254-CV, 2016 Tex. App. LEXIS 3303, at *8 (Tex. App.— Tyler Mar. 31, 2016, orig. proceeding) (mem. op.) (taking judicial notice of reporter's record filed in related mandamus proceeding); *Humphries v. Humphries*, 349 S.W.3d 817, 820 n.1 (Tex. App.—Tyler 2011, pet. denied) (explaining that appellate court may take judicial notice of own records in related proceeding involving same parties).

emergency order—Supreme Court's emergency order allows for that extension, and so, I'm extending it." On this record, we conclude that the trial court did not lose jurisdiction when it extended the initial dismissal date.

Concerning the trial court's orders granting additional extensions of the dismissal date, the trial court relied on the Texas Supreme Court's relevant subsequent emergency orders. The trial court last extended the dismissal date in an order signed on August 18, 2021, extending the dismissal date to December 1, 2021, and the trial on the merits commenced before that date. Having concluded that the trial court's initial extension of the statutory deadline complied with the *Eighteenth Emergency Order* and section 263.401, it follows that the trial court's additional extensions were proper. *See C.C.*, 2022 Tex. App. LEXIS 2477, at *9. As we recently explained,

> [A]lthough the Eighteenth Emergency Order and subsequent orders required that the extension of the initial dismissal date comply with Section 263.401, the orders did not require compliance with Section 263.401 for additional extensions, providing instead that "for any case whose dismissal date was previously modified under [an earlier emergency order]," the trial court could simply "extend the dismissal for an additional period not to exceed 180 days from the date of" the order.

*Id.*; *see also In re J.-R.A.M.*, No. 10-20-00221-CV, 2020 Tex. App. LEXIS 10403, at *6–7 (Tex. App.—Waco Dec. 30, 2020, pet. denied) (mem. op.) ("While the [later] emergency orders do expressly require compliance with Section 263.401(a) regarding an initial extension, they do not expressly require compliance with an extension granted after the initial extension."). Because the trial on the merits commenced before the last dismissal date of December 1, 2021, we conclude that the trial court did not lose jurisdiction over this case. We overrule Mother's first and second issues.

19

*Discovery Sanctions*

In her third issue, Mother argues that the discovery sanctions against her were excessive and that the trial court abused its discretion when it prohibited her from presenting evidence at trial through exhibits or non-party witnesses.

During the case, the Department sought discovery from Mother and filed multiple motions to compel responses to its discovery requests. The trial court signed an order granting the Department's motion to compel and, after Mother failed to comply with the trial court's order, sanctioned Mother by prohibiting her from calling witnesses at trial, except for named parties; introducing any evidence opposing the Department's case against Father; or introducing any document or physical item into evidence. *See* Tex. R. Civ. P. 193.6 (providing that party may not introduce evidence that was not timely disclosed when party failed to respond to discovery unless court finds good cause and that failure to respond did not unfairly surprise or prejudice other parties). In its order sanctioning Mother, the trial court found that on December 30, 2020, Mother was served with discovery; on April 21, 2021, the trial court ordered Mother to turn over all responsive material by May 5, 2021; as of May 26, 2021, Mother had failed to turn over any responsive materials; the trial court had considered lesser sanctions; and the Department's requested sanctions were just.

We review a trial court's sanctions for abuse of discretion. *See Koslow's v. Mackie*, 796 S.W.2d 700, 704 (Tex. 1990); *Van Heerden v. Van Heerden*, 321 S.W.3d 869, 877 (Tex. App.—Houston [14th Dist.] 2010, no pet.). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles, or equivalently, whether under all the circumstances of the particular case the trial court's action was arbitrary or unreasonable." *Koslow's*, 796 S.W.2d at 704 (citing *Downer v. Aquamarine*

20

*Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)).  The Texas Supreme Court has created a two-part test for determining whether a sanction for discovery abuses is just.  *See TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991); *Taylor v. Taylor*, 254 S.W.3d 527, 533 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *In re N.R.C.*, 94 S.W.3d 799, 810–11 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).  The test requires a reviewing court to consider whether there is a direct relationship between the offensive conduct and the sanctions imposed and whether the sanction was excessive.  *TransAmerican Nat. Gas Corp.*, 811 S.W.2d at 917; *Van Heerden*, 321 S.W.3d at 878; *In re N.R.C.*, 94 S.W.3d at 810–11.

Mother does not dispute that she did not comply with the trial court's orders compelling discovery responses and that there was a direct relationship between her failure to respond to the discovery requests and the trial court's sanctions but argues that the sanctions were excessive and that lesser sanctions should have been ordered.  She, however, has not provided a reasonable explanation or excuse for why she failed to comply with the orders, and the trial court in its order stated that it had considered lesser sanctions and that the Department's requested sanctions were just.  On this record, we cannot conclude that the trial court abused its discretion when it sanctioned Mother.  *See TransAmerican Nat. Gas Corp.*, 811 S.W.2d at 917; *Koslow's*, 796 S.W.2d at 704; *see also* Tex. R. Civ. P. 193.6 (providing that party may not introduce evidence that was not timely disclosed when party failed to respond to discovery unless court finds good cause and that failure to respond did not unfairly surprise or prejudice other parties).

We also cannot conclude that the trial court's sanctions against Mother probably caused the rendition of an improper judgment.  *See* Tex. R. App. P. 44.1(a) (providing that no judgment may be reversed on appeal on ground that trial court made error of law unless court of

21

appeals concludes that complained-of error "probably caused the rendition of an improper judgment"); *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000) (describing how courts determine when excluded evidence probably resulted in rendition of improper judgment); *Van Heerden*, 321 S.W.3d at 877 (same). "In determining if the excluded evidence probably resulted in the rendition of an improper judgment, a court must review the entire record." *Able*, 35 S.W.3d at 617. Mother has not directed this Court to evidence that she was not allowed to admit at trial that would have changed the outcome of the trial,[17] and she has not challenged the sufficiency of the evidence to support the jury's endangerment and best-interest findings against her. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (2). The evidence at trial included the results of Child's hair follicle testing that showed high levels of methamphetamine, Mother's endangerment of Child by breastfeeding Child while using illegal drugs, and Child's diagnosis of amphetamine poisoning and delayed fine and gross motor skills. Reviewing the entire record, we cannot conclude that the trial court's sanctions against Mother probably resulted in the rendition of an improper judgment. *See Able*, 35 S.W.3d at 617. We overrule her third issue.

*Fairness of Trial Court Proceedings*

In her fourth issue, Mother argues that the trial court failed to properly apply the law and hold the Department "accountable for extreme government overreach" and that the "cumulative error was so prejudicial to [Mother] that it caused the rendition of an improper verdict." She argues that the trial court's "pre-trial proceedings and trial were so fundamentally

---

[17] In her reply brief, Mother references her "attempt to put on PARTY-WITNESS testimony" of "3 Department employees" and "the files of all 5 witness [Department] employees." She, however, has not shown how this evidence would have impacted the jury's determinations.

22

unfair that the entire process was not anything close to the meaning of American jurisprudence" and that "[t]he case should be dismissed and all orders vacated."

Among her complaints, Mother challenges the trial court's order for the protection of Child and removal, arguing that Child was removed without due process and that "the Department did not have good cause for the government intrusion on N.T.'s and [Child]'s constitutional rights to privacy, family integrity and 4th Amendment rights against unlawful search and seizure." But "a temporary order is superseded by entry of a final order of termination, rendering moot any complaint about the temporary order." *In re A.K.*, 487 S.W.3d 679, 683 (Tex. App.—San Antonio 2016, no pet.) (citations omitted); *see In re K.P.*, 2014 Tex. App. LEXIS 9263, at *36–37 (holding that parents' complaints about temporary order authorizing removal of children were moot because trial court had entered final order terminating parents' rights (citations omitted)). Thus, Mother's complaints about the trial court's temporary orders, including its order for protection and removal of Child, are moot.

Mother also cites articles documenting trauma or harm experienced by children who are removed from their parents, but in this case, Mother has not challenged the sufficiency of the evidence to support the endangerment and best interest findings against her. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (2). The evidence at trial, summarized above, showed that prior to removal, Mother's conduct was endangering Child, and that after Child was removed from the parents' care, Child was safe and well-taken care of. The foster parents testified at trial that Child was doing well in their care and no longer developmentally delayed. The evidence showed that the foster parents were meeting Child's needs, bonded with her, and hoped to adopt her if the parents' rights were terminated. Mother also last visited with Child in early 2020, almost two years before trial.

23

Based on our review of the record, we conclude that Mother has not shown that the trial court's proceedings were fundamentally unfair to her. We overrule her fourth issue.

## CONCLUSION

Having overruled the parents' issues, we affirm the trial court's amended order of termination.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed:   June 22, 2022